**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Hai Van Le, | No. CV 11-0744 PHX RCB (ECV) |
| Plaintiff, | |
| vs. | **O R D E R** |
| Arizona Department of Corrections, et al., | |
| Defendants. | |

Plaintiff Hai Van Le brought this civil rights action pursuant to 42 U.S.C. § 1983 against several employees of the Arizona Department of Corrections (ADC). (Doc. 1.) The remaining Defendants—ADC Director Charles Ryan, Deputy Warden Hugh Matson, Protective Segregation Administrator Herb Haley, and Correctional Officers John Osborn and Michelet Smith—move for summary judgment.[1] (Doc. 59.)

The Court will grant the motion in part and deny it in part.

**I.   Background**

Plaintiff's Complaint raises a claim for failure to protect; specifically, Plaintiff asserted that Defendants ignored, denied, or failed to thoroughly investigate his complaints that a kill-on-sight order had been issued against Plaintiff by a member of the Mexican Mafia prison gang and that this led to Plaintiff's assault. Plaintiff made a request to Defendants for

---

[1] The Court provided Plaintiff the Notice required by Rand v. Rowland, 154 F.3d 952, 962 (9th Cir. 1998) (*en banc*). (Doc. 60.)

Protective Segregation (PS) while at the Browning Unit; he did not receive PS and he was transferred to the Morey Unit on July 9, 2010, and assaulted that same day.

## II.    Legal Standards

### A.    Summary Judgment

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). Under summary judgment practice, the moving party bears the initial responsibility of presenting the basis for its motion and identifying those portions of the record, together with affidavits, which it believes demonstrate the absence of a genuine issue of material fact. Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party who must demonstrate the existence of a factual dispute and that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 250; see Triton Energy Corp. v. Square D. Co., 68 F.3d 1216, 1221 (9th Cir. 1995).

When considering a summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits or declarations, if any. See Fed. R. Civ. P. 56(c). At summary judgment, the judge's function is not to weigh the evidence and determine the truth but to determine whether there is a genuine issue for trial. Anderson, 477 U.S. at 249. The evidence of the non-movant is "to be believed, and all justifiable inferences are to be drawn in his favor." Id. at 255.

### B.    Failure to Protect

States are obligated by the Eighth Amendment to protect prisoners from violence at the hands of other inmates. Farmer v. Brennan, 511 U.S. 825, 833 (1994). But mere negligent failure to protect an inmate from another inmate is not actionable under § 1983. Davidson v. Cannon, 474 U.S. 344 (1986). A prison official violates the Eighth Amendment

1  in failing to protect one inmate from another only when two conditions are met.  First, the
2  alleged constitutional deprivation must be, objectively, "sufficiently serious;" the official's
3  act or omission must result in the denial of "the minimal civilized measure of life's
4  necessities."  Farmer, 511 U.S. at 834.  Second, the prison official must have a "sufficiently
5  culpable state of mind," *i.e.*, he must act with deliberate indifference to inmate health or
6  safety.  Id.  To demonstrate that a prison official was deliberately indifferent to the threat of
7  serious harm or injury by another prisoner, a plaintiff must show that the "the official [knew]
8  of and disregard[ed] an excessive risk to inmate . . . safety; the official must both be aware
9  of facts from which the inference could be drawn that a substantial risk of serious harm
10 exists, and [the official] must also draw the inference."  Id. at 837; Gibson v. County of
11 Washoe, 290 F.3d 1175, 1187-88 (9th Cir. 2002).  To prove that officials knew of the risk,
12 however, the prisoner may rely on circumstantial evidence; in fact, the very obviousness of
13 the risk may be sufficient to establish knowledge.  See Farmer, 511 U.S. at 842; Wallis v.
14 Baldwin, 70 F.3d 1074, 1077 (9th Cir. 1995).

15       In addition, prison officials who actually knew of a substantial risk to inmate health
16 or safety may be found free from liability if they responded reasonably to the risk, even if the
17 harm ultimately was not averted.  A prison official's duty under the Eighth Amendment is
18 to ensure " 'reasonable safety.'"  Farmer, 511 U.S. at 844 (internal citations omitted).

19 **III.   Motion for Summary Judgment**
20       **A.    Parties' Contentions**[2]
21            **1.    Defendants**
22    Defendants assert that Plaintiff requested PS on December 21, 2005, August 23, 2006,
23 and June 7, 2007.
24       In his December 21, 2005 PS Request, Plaintiff stated that the reason for his request
25 was because he was caught in the middle of an inmate war.  (DSOF ¶ 4.)  On December 27,
26 2005, after an investigation, Plaintiff's request was denied and Plaintiff was granted
27
28       [2]In support of their motion, Defendants submit their Statement of Facts (Doc. 58 (DSOF) and numerous exhibits.  Plaintiff submits his response with exhibits.  (Doc. 61.)

1   Alternative Placement and moved to another unit. (DSOF ¶ 5.)

2   On December 29, 2005, Plaintiff appealed the denial of PS, stating that the reasons he listed in his December 21, 2005 request were false. (DSOF ¶ 6.) On December 30, 2005, Plaintiff again stated that the reasons he listed for seeking PS on in his December 21, 2005 request were false, that the actual reason he sought PS was because he owed money to another inmate because he lost drugs he was supposed to transport for New Mexico Mafia, and that he lied because he did not want prison authorities to know that he owed money for drugs. (DSOF ¶ 7.) On January 9, 2006, Warden Hennessy upheld the decision to assign Plaintiff to a general population (GP) yard. (DSOF ¶ 8.)

In his August 23, 2006 PS Request, Plaintiff stated that he needed protection from two inmates who said that he was a "death [sic] man before rec." (DSOF ¶ 9.) On September 18, 2006, after an investigation of this Request, the inmates who allegedly threatened Plaintiff were placed on his Do Not House With (DNHW) list; Plaintiff appealed and was given Alternative Placement and moved to another unit. (DSOF ¶ 10.) Plaintiff did not have any other incidents with these particular inmates after they were placed on his DNHW list. (DSOF ¶ 10.)

On June 7, 2007, Plaintiff requested PS, asserting that he was receiving threats from another inmate in the New Mexican Mafia because he owed $200 to the inmate for drugs. (DSOF ¶ 11.) On June 13, 2007 after an investigation, Matson issued a decision for Alternative Placement to move Plaintiff to another unit and added the inmate who allegedly threatened Plaintiff to Plaintiffs DNHW List. (DSOF ¶ 12.) Plaintiff did not have any other incidents with this particular inmate after he was placed on Plaintiff's DNHW list. (DSOF ¶ 12.)

Plaintiff alleges he submitted an Inmate Letter to Smith on October 7, 2009, in which he stated a "kill on site" order was issued on his life by inmate Fernando Cordova. (Doc. 1 at 3.) But the Inmate Letter actually stated that Plaintiff's life was "in danger" because he "used to run with the Raza" but had switched to a "Daisa;" the letter did not mention a "kill on site" order. (DSOF ¶ 14.)

- 4 -

1    Plaintiff also alleges that he submitted an Inmate Letter to Osborn on November 16, 2009, stating that a "kill on site" order was issued on his life by inmate Fernando Cordova. (Doc. 1 at 3.) But the Inmate Letter actually stated that Plaintiff requested PS because he jumped race "from Mexican American to Mexican National in 2008" and did not mention a "kill on site" order. (DSOF ¶ 15.)

   Plaintiff alleges his sister, Ha Le, submitted a letter to Ryan on August 12, 2009, which stated Mexican Mafia inmates were ordered by Fernando Cordova to kill Plaintiff but that Defendants "disregarded" the letter. (Doc.1 at 4-A.) In his responses to Defendants' First Set of Interrogatories, Plaintiff included a letter from Ha Le to "Chuck Ryan," which actually stated that Plaintiff believed that the "Mexican Mafia try to kill him because he wouldn't sell drug [sic] for them." (DSOF ¶ 13.) According to Defendants, the letter was not "disregarded," and ADC Constituent Services responded to Ms. Le on September 2, 2009. (DSOF ¶ 13.)

   Plaintiff further alleges he requested PS on August 1, 2009 and April 2010. (Doc. 1 at 4-A.) Defendants assert that Plaintiff has not provided any evidence to support these allegations and that ADC has no record of these requests. (DSOF ¶ 2.) During his deposition, Plaintiff stated that he would send information regarding these requests to undersigned counsel. (DSOF ¶ 2.) On August 18, 2012, more than a week after the August 6, 2012 discovery deadline, Plaintiff sent Defendants' counsel two ADC forms attached to "Plaintiff Respond [sic] to Defendants Deposition [sic]". The forms are handwritten, presumably by Plaintiff, and do not provide any evidence that Plaintiff requested PS on August 1, 2009 or during April 2010. (DSOF ¶ 3.)

   Defendants argue that Plaintiff mischaracterizes his Inmate Letters of October 7 and November 16, 2009, and assert that Defendants did not disregard Plaintiff's sister's letter. (Doc. 59 at 4-5.) They assert that although Plaintiff's Complaint alleges that he requested PS on August 1, 2009 and April 10, 2010, ADC has no record of these requests. (Id. at 5.) Defendants also assert that there is no evidence that the alleged assault occurred; the Complaint alleges four inmates attacked Plaintiff but after the alleged assault, Plaintiff

- 5 -

claimed it was three inmates, and a knuckle-and-body check was negative. (Id. at 6.) In addition, Plaintiff had a small laceration, a swollen lip and a small bump on the back of his head, but he did not lose consciousness. He provided no witnesses to the alleged attack. (Id. at 10-11.)

Defendants further argue that Plaintiff fails to show they were deliberately indifferent to his safety because they investigated each request and responded reasonably by moving Plaintiff to another unit or adding inmates to his DNHW list. (Id. at 7.) They contend that Ryan cannot be held liable for the acts of other employees and that the August 12, 2009 letter from Plaintiff's sister was forwarded to ADC Constituent Services, which responded. (Id. at 8.) Moreover, Plaintiff did not alert Osborn, Smith, or Matson to a kill-on-sight order. (Id.) The Inmate Letters of October 7 and November 16 stated only that Plaintiff "*believed* he was in danger because he had changed affiliations." (Id. at 8-9.) Defendants also argue that Plaintiff fails to plead any facts to support a claim against Haley. (Id.)

### 2. **Plaintiff**

Plaintiff responds to Defendants' Motion and asks that the Court enter summary judgment in his favor.[3] (Doc. 61.) Plaintiff asserts that in December 2005, July and August 2006, June and August 2007, and April 2010, he requested PS. (Doc. 61 at 1.) He asserts that all Defendants ignored his requests six times and sent him back out to GP at Morey Unit where he was assaulted. (Id.) He argues that every time he requested PS he stated that his life was in danger or that the Mexican Mafia wanted to kill him and he asks how that is different from telling them there was a kill-on-sight order. (Id. at 3.)

Plaintiff alleges that after the assault, he told an officer that three or four Mexican Mafia soldiers had assaulted him. Prison officials looked in the computer for the nicknames

---

[3]Defendants ask that Plaintiff's request for summary judgment be stricken. (Doc. 63 at 2.) They argue that the motion is untimely because the deadline for dispositive motions was October 8, 2012. (Id.) Plaintiff's response is actually dated October 1, 2012; under the "prison mailbox rule," a complaint is deemed "filed" when handed by the prisoner to a prison official for mailing. See Houston v. Lack, 487 U.S. 266, 270-71 (1988); Stillman v. LaMarque, 319 F.3d 1199, 1201 (9th Cir. 2003). But Plaintiff fails to include a separate statement of facts, as required by Local Rule of Civil Procedure 56.1. Therefore, the Court will construe Plaintiff's pleading only as his response to Defendants' motion.

1  and found three of them. (Id.) As to eyewitnesses, Plaintiff contends that Defendants know
2  that on GP yards, inmates cannot tell prison officials what they see for fear of being labeled
3  a snitch and putting their own lives in danger. (Id. at 4.)

4  After the assault, Plaintiff was taken to a prison medical complex and then to an
5  outside hospital; the doctor there found that Plaintiff suffered head trauma, head contusion,
6  and acute cervical strain. (Id. at 3 and 22, St. Joseph's Hospital Emergency Dep't. Nursing
7  Notes, dated July 9, 2010.)

8  Plaintiff argues that Ryan is the Director and responsible for all his staff and that
9  Haley is the PS Administrator and they both knew that Plaintiff's life was in danger because
10 Plaintiff's sister wrote and called. He claims that Haley told his sister that Plaintiff did not
11 have any issues because he had not yet been assaulted. (Id. at 4.)

12 Plaintiff asserts that although he is now in PS, his approval for that placement did not
13 happen until he was assaulted. (Id. at 5.) He claims that he has established that Defendants
14 are evil and that he endured lockdown after lockdown for almost five years just to get
15 approval for PS. (Id.)

### 3. Reply

17 Defendants reply that Plaintiff's response does not comply with Rule 56.1(b) because
18 there is no separate statement of facts, he cannot merely rely on what is in his Complaint, and
19 he did not set out specific facts in declarations or depositions that contradict Defendants'
20 facts. (Doc. 63 at 3.) They argue that the Court should strike Plaintiff's new allegations: that
21 Haley told Plaintiff's sister that Plaintiff "don't have no issues because plaintiff haven't been
22 assaulted yet"[sic]; that "defendants don't care if plaintiff get kill [sic] or not;" and that
23 "defendants are very evil and intended to sent [sic] plaintiff back to General populations [sic]
24 yards to get kill" [sic]. (Id.) Although Plaintiff alleges in his response that he requested
25 protective segregation six times, in his complaint, he alleged he requested protective
26 segregation five times. Plaintiff does not indicate when the additional request allegedly
27 occurred. Prior to his Response, Plaintiff did not raise these specific allegations and has not
28 presented any documents or declarations to support them.

1    Defendants also assert that Plaintiff's response improperly relies on his own
2    allegations made in the Complaint. (Id. at 4.) They argue that Plaintiff's entire case is based
3    on his own testimony and he has not and cannot prove that he was actually attacked.

**B.    Analysis**

The Court will grant summary judgment to Osborn and deny summary judgment to the remaining Defendants.

First, the Court rejects Defendants' suggestion that they are entitled to summary judgment based on procedural deficiencies in Plaintiff's response. See Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010) ("We have . . . held consistently that courts should construe liberally motion papers and pleadings filed by pro se inmates and should avoid applying summary judgment rules strictly.")

Next, the Court rejects Defendants' argument that Plaintiff cannot prove the July 2010 assault. To survive summary judgment, Plaintiff need not conclusively prove that he was assaulted. See First Nat'l Bank of Arizona v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968) (the opposing party need not establish a material issue of fact conclusively in its favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.") Here, Plaintiff offers his testimony about the assault—a matter plainly within his personal knowledge. See Johnson v. Woodford, 336 Fed. App'x 594 (9th Cir. 2009) (the Court must consider the verified complaint of a pro se plaintiff) (citing Jones v. Blanas, 393 F.3d 918, 923 (9th Cir. 2004)). Moreover, Plaintiff submits evidence showing that he was injured on that date.

Turning to the merits, as to Plaintiff's requests for PS made in December 2005, August 2006, and June 2007, it is undisputed that Plaintiff was not placed in PS. As to the December 2005 request, it appears that Plaintiff was merely assigned to GP. As to the August 2006 request, the threatening inmates were placed on Plaintiffs DNHW list and Plaintiff was moved to another unit; Plaintiff does not dispute that he had no further incidents with them. In response to the June 2007 request for PS, Plaintiff was moved to another unit and the inmate who allegedly threatened Plaintiff was added to Plaintiff's DNHW list.

1  Plaintiff does not dispute Defendants' descriptions of these PS requests—that is, that
2  he was threatened by particular inmates—or the actions taken by prison officials in
3  response, although he argues that he should have been placed in PS.  The Court believes
4  that to the extent that Plaintiff was denied placement in PS in response to these
5  requests—2005, 2006, 2007, the denials are too remote in time to form the basis of a
6  claim for an assault in July 2010.  Moreover, the evidence shows that prison officials took
7  some action in response to the last two requests.  See Farmer, 511 U.S. at 844.

8  But Plaintiff also claims that his sister sent a letter to Ryan on August 12, 2009
9  asking for placement in PS.  (Doc. 58, Ex. 23; Doc. 61 at 20.)  The letter states that
10 Plaintiff told his sister that the Mexican Mafia would try to kill him because Plaintiff
11 would not sell drugs for them and that wherever Plaintiff goes, they will have someone
12 kill him.  (Id.)  Defendants do not dispute that Ryan received the letter; in fact, it was
13 responded to by ADC Constituent Services Office on September 2, 2009.  (Doc. 58, Ex.
14 24.)  The response letter states that ADC uses an investigative factfinding process when
15 inmates believe they need protection from other inmates and that the letter would be sent
16 to the PS Administrator.  (Id.)  Plaintiff also attaches a letter addressed to Ryan from
17 Plaintiff, dated August 2, 2009, outlining his allegations of a need for PS.  (Doc. 61 at 16-
18 19.)

19 Plaintiff submitted a an Inmate Letter to Smith, dated October 7, 2009.  (Doc. 58,
20 Ex. 25.)  In it Plaintiff requests PS because he feels that his life is in danger due to a "run
21 in with the RAZA" but that he had switched to a Daisa and knows that his life is in
22 danger.  (Id.)

23 In addition, Plaintiff submits an Inmate Letter, dated November 16, 2009,
24 addressed to CO IV Osborn.  In it Plaintiff asks for placement in PS because he "jumped
25 race" from Mexican [illegible] to Mexican National in 2008 and he "pc up" on all the
26 yards, which makes him a rat to GP inmates.  (Id. at 15.)  He asserts that his life is in
27 danger if he goes back to a GP yard.  The handwritten response at the bottom of the
28 document appears to be from or authorized by Hugh Matson, contains a telephone

1 number, and states "Per C/O (central office) your request is denied." (Id.)

2 Viewing the evidence in the light most favorable to Plaintiff, he requested PS in 3 August, October, and November 2009 while housed at the Browning Unit because he 4 believed his life was in danger if he was housed in a GP unit; he either received no 5 response to the request or the request was denied without a reason; and he was transferred 6 from the Browning Unit to the GP Morey Unit on July 9, 2010, and assaulted the same 7 day.

8 Defendants do not deny receiving the documents, nor do they explain what action, 9 if any, they took to investigate the allegations in the letter from Plaintiff's sister or 10 Plaintiff's own Inmate Letters. Defendants submit no affidavits or declarations. Rather, 11 they argue that Plaintiff has mischaracterized these letters and that the letters do not 12 contain a kill-on-sight allegation. The Court agrees that the letters do not allege a kill-on-13 sight threat, but they plainly express a belief that Plaintiff is in danger from other inmates 14 if he is placed in a GP yard. Without evidence that Defendants investigated Plaintiff's 15 concerns, the Court cannot determine that they acted reasonably in response to Plaintiff's 16 perceived threats.

17 While Ryan cannot be held responsible merely as the supervisor of others, see 18 Monell v. New York City Dep't of Social Services, 436 U.S. 658, 691-92 (1978), both the 19 sister's letter and Plaintiff's November Inmate Letter were addressed to Ryan. As noted, 20 there are no affidavits or declarations from Defendants, so Ryan does not dispute 21 receiving these letters. Without admissible evidence regarding the steps Ryan took in 22 response to these letters, the Court cannot determine that he acted reasonably. Likewise, 23 the response to the letter from Plaintiff's sister states that the information will be sent to 24 the PS Administrator. That appears to be Haley, but there is no evidence what Haley did, 25 if anything, in response to the information. Similarly, Matson appears to have been aware 26 of Plaintiff's November 16 Inmate Letter; there is nothing from Matson disputing that the 27 response was provided by him and no indication what steps he took regarding Plaintiff's 28 concerns. And the October 2009 Inmate Letter is to Smith but there is no evidence of any

action taken by Smith in response.

Accordingly, the Court will deny summary judgment to Ryan, Haley, Matson, and Smith.

The Court will, however, dismiss Osborn. Plaintiff makes no particular allegations as to Osborn, and it appears that Osborn forwarded the Inmate Letter, dated November 16, 2009. There is no evidence that Osborn, a Correctional Officer, could have otherwise acted on his own to provide Plaintiff PS.

**IT IS ORDERED:**

(1) The reference to the Magistrate Judge is withdrawn as to Defendants' Motion for Summary Judgment (Doc. 59.)

(2) Defendants' Motion for Summary Judgment (Doc. 59) is **granted as to Osborn** and **denied in all other respects**.

(3) The remaining claim is for a failure to protect against Ryan, Haley, Matson, and Smith.

DATED this 28th day of November, 2012.

_____
Robert C. Broomfield
Senior United States District Judge

- 11 -