1    WO

2

3

4

5

6                    **IN THE UNITED STATES DISTRICT COURT**

7                       **FOR THE DISTRICT OF ARIZONA**

8

9    Hai Van Le,                              No.  CV 11-0744-PHX-RCB (ECV)

10                          Plaintiff,

11        vs.                                        **O R D E R**

12   Arizona Department of Corrections, et

13   al.,

14                          Defendants.

15

16         Plaintiff Hai Van Le brought this civil rights action pursuant to 42 U.S.C. § 1983

17   against several employees of the Arizona Department of Corrections (ADC).  (Doc. 1.)

18   The remaining Defendants—ADC Director Charles Ryan, Deputy Warden Hugh Matson,

19   Protective Segregation Administrator Herb Haley, and Correctional Officer Michelet

20   Smith—file a second motion for summary judgment.[1]  (Doc. 72.)  In addition, Plaintiff

21   files a response and cross-motion for summary judgment (Doc. 76) and a motion for

22   Extension of Time to Respond to the Court's *Rand* notice (Doc. 80).  Defendants file a

23   Motion to Strike Plaintiff's Motion for Summary Judgment (Doc. 84) and Plaintiff moves

24   for Leave to File his Cross-motion (Doc. 85).

25         The Court will grant Defendants' Motion for Summary Judgment, grant Plaintiff's

26   Motion for Extension of Time to Respond to the Court's *Rand* notice, and deny

27   _____

28   [1]The Court provided Plaintiff a second Notice required by *Rand v. Rowland*, 154 F.3d
     952, 962 (9th Cir. 1998) (*en banc*).  (Doc. 78.)

1  Plaintiff's Motion to File a Cross-motion for Summary Judgment.

2  **I.     Background**

3        Plaintiff's Complaint raised a claim for failure to protect; specifically, Plaintiff

4  asserted that Defendants ignored, denied, or failed to thoroughly investigate his

5  complaints that a kill-on-sight order had been issued against Plaintiff by a member of the

6  Mexican Mafia prison gang and that this led to Plaintiff's assault.  Plaintiff made a

7  request to Defendants for Protective Segregation (PS) while at the Browning Unit; he did

8  not receive PS, he was transferred to the Morey Unit on July 9, 2010, and he was

9  assaulted that same day.  (Doc. 8.)

10        In ruling on Defendants' previous Motion for Summary Judgment, the Court

11  concluded that the denials of protective segregation requests in 2005, 2006, and 2007 are

12  too remote in time to form the basis of a claim for an assault in July 2010.  (Doc. 64 at 9.)

13  In their second Motion for Summary Judgment, Defendants, therefore, focus on events in

14  late 2009 and 2010 before the July 2010 assault.  (Doc. 72 at 1.)  In support of their

15  Motion, they submit their separate Statement of Facts (Doc. 73 (DSOF2)) the declaration

16  of Marlene Coffey, Associate Deputy Warden and ADC Protective Segregation Custody

17  Administrator (*id.*, Ex. 1), the declarations of Defendants Smith and Haley (*id.*, Exs. 2

18  and 3, respectively), and other exhibits.  They also incorporate by reference their SOF

19  filed in support of their first Motion for Summary Judgment.  (Doc. 72 at 6; ref. Doc. 58

20  (DSOF1).)

21  **II.    Legal Standards**

22        **A.      Summary Judgment**

23        A court "shall grant summary judgment if the movant shows that there is no

24  genuine dispute as to any material fact and the movant is entitled to judgment as a matter

25  of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23

26  (1986).   Under summary judgment practice, the moving party bears the initial

27  responsibility of presenting the basis for its motion and identifying those portions of the

28

1   record, together with affidavits, which it believes demonstrate the absence of a genuine

2   issue of material fact.  *Id.* at 323.

3        If the moving party meets its initial responsibility, the burden then shifts to the

4   opposing party who must demonstrate the existence of a factual dispute and that the fact

5   in contention is material, i.e., a fact that might affect the outcome of the suit under the

6   governing law, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and that the

7   dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict

8   for the non-moving party.  *Id.* at 250; *see Triton Energy Corp. v. Square D. Co.*, 68 F.3d

9   1216, 1221 (9th Cir. 1995).

10        When considering a summary judgment motion, the court examines the pleadings,

11   depositions, answers to interrogatories, and admissions on file, together with the

12   affidavits or declarations, if any.  *See* Fed. R. Civ. P. 56(c).  At summary judgment, the

13   judge's function is not to weigh the evidence and determine the truth but to determine

14   whether there is a genuine issue for trial.  *Anderson*, 477 U.S. at 249.  The evidence of

15   the non-movant is "to be believed, and all justifiable inferences are to be drawn in his

16   favor."  *Id.* at 255.

17        **B.     Failure to Protect**

18        States are obligated by the Eighth Amendment to protect prisoners from violence

19   at the hands of other inmates.  *Farmer v. Brennan*, 511 U.S. 825, 833 (1994).  But mere

20   negligent failure to protect an inmate from another inmate is not actionable under § 1983.

21   *Davidson v. Cannon*, 474 U.S. 344 (1986).   A prison official violates the Eighth

22   Amendment in failing to protect one inmate from another only when two conditions are

23   met.   First, the alleged constitutional deprivation must be, objectively, "sufficiently

24   serious;" the official's act or omission must result in the denial of "the minimal civilized

25   measure of life's necessities."  *Farmer*, 511 U.S. at 834.  Second, the prison official must

26   have a "sufficiently culpable state of mind," i.e., he must act with deliberate indifference

27   to inmate health or safety.  *Id.*  To demonstrate that a prison official was deliberately

28   indifferent to the threat of serious harm or injury by another prisoner, a plaintiff must

- 3 -

show that the "the official [knew] of and disregard[ed] an excessive risk to inmate . . . safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [the official] must also draw the inference." *Id.* at 837; *Gibson v. County of Washoe*, 290 F.3d 1175, 1187-88 (9th Cir. 2002). To prove that officials knew of the risk, however, the prisoner may rely on circumstantial evidence; in fact, the very obviousness of the risk may be sufficient to establish knowledge. *See Farmer*, 511 U.S. at 842; *Wallis v. Baldwin*, 70 F.3d 1074, 1077 (9th Cir. 1995).

In addition, prison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted. A prison official's duty under the Eighth Amendment is to ensure "'reasonable safety.'" *Farmer*, 511 U.S. at 844 (internal citations omitted).

## III. Preliminary Issues

The Court will deny Plaintiff's Motion for Leave to File a Cross-motion for Summary Judgment. (Doc. 85.) After the first Motion for Summary Judgment was denied in part by Order dated April 11, 2013, Defendants promptly moved for leave to file a second motion. (Docs. 66, 67.) The Court granted the motion on May 17, permitting Defendants to file and serve such a motion with 15 days of the Order. (Doc. 71.) Defendants filed their second motion on May 26. (Doc. 72.) But Plaintiff neither made a motion for leave to file a motion for summary judgment when Defendants filed their motion for leave nor filed his motion within 15 days of the Order. Rather, Plaintiff waited to file his response and cross-motion until June 7. (Doc. 76.) And he did not seek leave to file a motion for summary judgment until August 5. (Doc. 85.) His motion is untimely.

The Court will, however, grant Plaintiff's Motion for an Extension of Time to Respond to the *Rand* Notice. Thus, the Court will construe Plaintiff's response and

cross-motion and his Supplemental Response, which was filed after the *Rand* warning was sent, as responses to Defendants' Motion.

### III.   Motion for Summary Judgment

#### A.   Parties' Contentions

##### 1.   Defendants

Defendants assert that Plaintiff requested protective segregation (PS) in 2005, 2006, and 2007.  (Doc. 72 at 2; ref. Doc. 61 at 1; Doc. 64 at 8.) The requests were denied, but Plaintiff was transferred to different yards and inmates were placed on his Do Not House With (DNHW) list.[1]  (Doc. 72 at 2; ref. Doc 64 at 8.)

---

[1] According to Defendants, the previous PS documents show the following:

In his December 21, 2005 PS, Plaintiff stated that the reason for his request was because he was caught in the middle of an inmate war.  (Doc. 58, DSOF1 ¶ 4, Ex. 5.)  On December 27, 2005, after an investigation, the PS request was denied and Plaintiff was given Alternative Placement and moved to another unit.  (*Id.* ¶ 5, Ex. 6.)

On December 29, 2005, Plaintiff appealed the denial of Protective Segregation. In his appeal, he stated that the reasons he listed in his December 21, 2005 request were false. (*Id.* ¶ 6, Ex. 7.)  On December 30, 2005, Plaintiff again stated that the reasons he listed for seeking PS in his December 21, 2005 request were false. He stated that the actual reason was because he owed money to another inmate because he lost drugs he was supposed to transport for New Mexican Mafia; Plaintiff lied because he did not want prison authorities to know that he owed money for drugs.  (*Id.* ¶ 7, Exs. 8-11.)  On January 9, 2006, the Warden upheld the decision to assign Plaintiff to a general population yard.  (*Id.* ¶ 8, Ex. 12.)

In his August 23, 2006 PS request, Plaintiff stated that he needed protection from two inmates who said that he was a "death [sic] man before rec." (*Id.* ¶ 9, Ex. 13.)  On September 18, 2006 after an investigation, the inmates who allegedly threatened Plaintiff were placed on his Do Not House With (DNHW) list; Plaintiff appealed the decision, was given Alternative Placement and moved to another unit, and did not have any other incidents with these inmates after they were placed on his DNHW list.  (*Id.* ¶ 10. Exs. 14-17.)

On June 7, 2007, Plaintiff requested PS, stating he was receiving threats from another inmate in the New Mexican Mafia because he owed $200 to the inmate for drugs. (*Id.* ¶ 11, Exs. 18-19.)  On June 13, 2007, after an investigation, Matson issued a decision for Alternative Placement to move Plaintiff to another unit and added the inmate who allegedly threatened Plaintiff to his DNHW List.  (*Id.* ¶ 12, Exs. 20-22.)  Plaintiff did not have any other incidents with this particular inmate after he was placed on Plaintiff's DNHW list.  (*Id.*)

Defendants assert that if an ADC inmate needs protection from other inmates—either generally or from specific inmates—ADC has a system in place to address the inmate's issues; Department Order 805 (DO 805), Protective Segregation, governs PS in the Arizona prison system and provides procedures for identifying and safeguarding inmates with legitimate protection needs.  (DSOF2 ¶ 3.) Placement in a PS unit is scrutinized for operational and security reasons.  (*Id.* ¶ 4.)

An inmate in need of protection has several options. The greatest degree of protection is PS status, *i.e.*, placement in a unit that houses other inmates identified as having safety concerns. There are multiple PS units throughout the prison system for these types of inmates. (*Id.* ¶ 5.) An alternative is transferring the inmate to a different bed assignment, cell block, prison unit, or prison complex; this is a viable plan when an inmate has a conflict with particular inmates, but is otherwise able to live among other prisoners.  (*Id.* ¶ 6.)  In addition, when an inmate is determined to pose a threat to the safety of another inmate, he is included on the inmate's DNHW list.  (*Id.* ¶ 7.)

To request PS, an inmate makes a written or verbal request for protection, which triggers a documented review of the inmate's need for long-term PS status.  (*Id.* ¶ 8.)  He is immediately isolated in a safe, reasonably secure area, and the Shift Commander is notified.  (*Id.* ¶ 9.)  Information is gathered about the inmate's concerns and eventually forwarded to the unit's deputy warden (DW), who reviews the initial information gathered by corrections staff to determine if a protection issue exists.  (*Id.* ¶¶ 10-15.)  The DW can request more information if an immediate solution cannot be reached.  (*Id.* ¶ 15.)  Once the DW determines that a protection issue exists, he recommends either PS or alternative placement to another unit.  (*Id.* ¶ 17.)

The DW's decision is forwarded to the PS Administrator (PSA) for review.  (*Id.* ¶ 18.) The PSA or PSA Committee reviews the documentation and makes a final decision.  (*Id.* ¶ 19.)  If the decision is different than that reached by the DW, there must be a written explanation of the rationale.  (*Id.*) The inmate can appeal the decision to the Population Management Administrator, who reviews the appeal and responds. The

Population Management Administrator makes the final decision on an inmate's appeal. (*Id.* ¶ 20.)

Plaintiff alleges that he sent inmate letters to officers Osborn[2] and Smith seeking PS in late 2009.  (Doc. 72 at 4; ref. Doc. 64 at 9.)  Plaintiff's sister also sent a letter to Director Ryan on August 12, 2009 asking that he be placed in PS.  (Doc. 61 at 20.) ADC's Constituent Services Office responded to this letter in September 2009, advising Plaintiff's sister that he needed to work with ADC investigators and staff to provide them information, not the Director's Office. (DSOF ¶ 43; Doc. 58, Ex. 24.)  Plaintiff's sister indicated that she understood and would communicate this to him.  (*Id.*)

Plaintiff also apparently made a PS request in January of 2008.  (DSOF ¶ 21.)  On January 8, 2010, DW Ramos requested further review of Plaintiff's PS request.  (*Id.*) Plaintiff was in the Arizona State Prison Complex-Eyman, Browning Unit (Browning) from mid-2008 through July 2010.  Browning is a maximum-security unit where inmates are isolated from other inmates. It is a secure unit, and inmates seeking PS are not moved from Browning while the DO 805 investigation and process is pending.  (*Id.* ¶ 22.)

Plaintiff alleges that on October 7, 2009, he submitted an Inmate Letter to Defendant Smith in which he stated a "kill on site" order was issued on his life by inmate Fernando Cardova.  (Doc. 8 at 4.) However, the Inmate Letter actually reiterated Plaintiff's previously denied requests related to the Mexican Mafia and stated that Plaintiff's life was "in danger" because he "used to run with the Raza" but had switched to a "Daisa."  (Doc. 58, DSOF1 ¶¶ 14, Ex. 25.)

On January 14, 2010, CO II Munoz interviewed Plaintiff as a result of an Inmate Letter he submitted to him dated January 8, 2010.  (DSOF2 ¶ 23.)  CO II Munoz noted that Plaintiff offered him $500 to place him in protective segregation.  CO II Munoz refused, and told Plaintiff his PS request was being evaluated.  An Inmate Disciplinary Report was filed about this incident.  (*Id.*)

---

[2] Osborn was previously dismissed.  (Doc. 64.)

On January 29, 2010, Plaintiff was placed in investigative detention while the protective segregation evaluation was pending; he remained in the Browning Unit.  (*Id.* ¶ 24.)   On February 9, 2010, Plaintiff completed and signed a Protective Segregation Inmate Statement, claiming:

> I have owe Fernando $1,600 and $200 to Santo they both are Mexican Mafia and I have P.C. up many time and everywhere I have been I have been threatened verbally that they will get me when they have a chance to and I know for a fact that my life will be in danger if I go back to a G.P. yards. So I'm requesting to go to a P.C. yard.
> Thank You.

(*Id.* ¶ 25.)

An investigative summary report, dated February 9, 2010, stated that "Inmate has not provided any new information that he has not already provided in the past when he was interviewed by ASPC Winslow SSU Officer Toner and CIU Investigator R. Moore." (*Id.* ¶ 26.)

On February 9, 2010, Officers Munoz and Chavez interviewed Plaintiff about his PS request and wrote in an Information Report that Plaintiff said he owed money to the Mexican Mafia for drugs and that he would be killed if he went to an open yard.  (*Id.* ¶ 27.)   On February 9, 2010, Officer Munoz completed a Protective Segregation Interview Assessment, recommending that the matter be forwarded to a CO IV for further review and on February 10, 2010, completed a Protective Segregation Security Initial Interview, which is a list of questions answered in his initial interview.  (*Id.* ¶¶ 28-29.) On February 23, 2010, DW Ramos concluded that alternative placement was an appropriate response to Plaintiff's PS request, reasoning that:

> Inmate has been through the PS process and has no substantiated information that can be verified of a drug debt of $1500.00. He is not on any hit list, nor is he able to provide any new information. Recommend Alternative Placement to A01.

(*Id.* ¶ 30.)  The issues concerning his drug debts were largely the same as alleged and investigated in 2006 when his PS was request was denied.  (Doc. 72 at 5; DSOF2, Coffey Decl. ¶¶ 27-29, 32.)

On April 2, 2010, PS Committee Chairperson Matson, as well as a member of the STG Unit and the Central Classification, agreed with DW Ramos' decision for alternative placement to PS.  (DSOF ¶ 31.)  The decision was presented to Plaintiff on or about April 22, 2010, and he was advised that he could appeal the decision.  Plaintiff indicated that he would not waive his appeal rights; however, there is no record of an administrative appeal being filed.  (*Id.* ¶ 32.)

Defendants assert that Smith does not remember receiving an inmate letter from Plaintiff in October of 2009 and denies it is his signature on the inmate letter.  It is signed as a CO II, and he had been a CO III for more than three years at the time of the letter.  (*Id.* ¶¶  34-35; *id.* Smith Decl. ¶¶ 4-5.)  Had Smith received this inmate letter, he would have moved Plaintiff to a secure area, and immediately notified his supervisor.  (*Id.* ¶ 37.)  Smith does not remember receiving this letter or notifying his supervisor about Plaintiff.  (*Id.*) Smith contends that he never had any information that Plaintiff was at risk of any harm and that this lawsuit was the first time Smith had any information that Plaintiff believed he was at risk.  (*Id.* ¶ 38.)

Defendants assert that Haley was not involved in PS matters for ADC in 2009 or 2010 and had no knowledge of Plaintiff's protective segregation request in 2009 or 2010, received no communications from him or anyone on his behalf that he believed he was at risk in 2009 or 2010, and had no knowledge or information that Plaintiff believed he was at risk in 2009 or 2010.  (*Id.* ¶¶ 40-42.)

Defendants also argue that they acted reasonably.  (Doc. 72 at 7-11.)  Matson was the PS Administrator at the time the 2010 PS request and agreed with DW Ramos's February 23, 2010, decision to deny PS request and alternatively place Plaintiff in another unit. Plaintiff's concerns and PS issues were investigated and addressed through

the investigation.  Although Plaintiff did not obtain the result he wanted, Matson was not indifferent to the threat and responded reasonably to the risk.  (*Id.* at 7.)

Haley was not involved in the 2009-2010 PS requests and Plaintiff makes no claim that Haley took any specific action.  (*Id.* at 9-10.)  As to Smith, in October, 2009, Plaintiff was in isolation in the Browning Unit and alleges that Smith forwarded his inmate letter to COI IV Osborn, his supervisor.  (Doc. 8 at 11; DSOF ¶ 37.)  Thus, Smith did what he was supposed to do under ADC policy, and Plaintiff was not injured between the time he allegedly gave the inmate letter to Smith and the time Plaintiff was involved in the PS process in January, 2010.  (*Id.* at 10.)

Defendants assert that Ryan responded reasonably to the potential threat posed to Plaintiff as outlined in the letter from his sister; Ryan forwarded it to the Constituent Services Office, and Plaintiff's sister was advised as to what her brother had to do.  Further, the assault did not happen until after a PS investigation was done.  (*Id*. at 11.)

Defendants argue that they are entitled to qualified immunity.  (*Id.* at 11-13.)

### 2.      Plaintiff

In support of his opposition (Doc. 76), Plaintiff submits his Statement of Facts (Doc. 77 (PSOF)), with inmate declarations (*id.*, Attach. A), his own declaration (*id.*, Attach. B), and documents from 2006 (*id.*, Ex. C).  He also submits his Supplemental Response with exhibits.  (Doc. 81.)

Plaintiff asserts that he agrees with DSOF 1-22 regarding how PS should work when it is requested.  (PSOF ¶ 1.)  He requested PS in 2005, 2006, 2007, 2008, 2009, and 2010 because his life was in danger.  (*Id.* ¶ 2.)  His sister wrote Ryan on August 12, 2009 asking that Plaintiff be placed in PS because his life was in danger.  (*Id.* ¶ 3.)  Plaintiff was denied PS for five years until he was assaulted on July 9, 2010.  (*Id.* ¶ 4.)

Plaintiff contends that the same information existed from 2005 until the assault in 2010.  (*Id.* ¶ 5; Doc. 58, Ex 28 confirming lists of Mexican Mafia members.)  He asserts that he provided the names of the people who threatened him on many occasions.  (PSOF ¶ 6; Doc. 58, Exs. 5, 8, 9, 10, 13, 15, 18, 19, 20, 21.)  He alleges that "Defendants know,

and it is common knowledge, that when you have problems with a prison gang, it does not go away and you cannot hide from them (except) in PS status." (PSOF ¶7, Attach. Inmate Decls.) Before the assault, Plaintiff wrote directly to Ryan begging for help. (*Id.* ¶ 9.) As far back as December 2005, Defendants were made aware that Plaintiff would have problems with the New Mexican Mafia, a prison gang, for giving their names and nicknames and involvement with smuggling. (*Id.* ¶ 11, Doc. 58 Criminal Investigation Report of Richard Moore.) Plaintiff asserts that his request for protection was found in the cell of the leader of the Hispanics. (*Id.* ¶ 12; Doc. 58, Ex. 7; Doc. 73 at 017, 019.)

Plaintiff argues that gang violence is well documented in Arizona and that prison murders are committed by gang members. (Doc. 76 at 5-6.) He asserts that when an inmate requests PS, he becomes *persona non grata*; if the problem is gang-related, it is from then on out a gang issue and the inmate is labeled a snitch, subject to attack at any time. (*Id.* at 6.) Status as a snitch can create a risk. (*Id.*) "This branding was accomplished when ADOC staff allowed Plaintiff's request for protection to fall into the hands of gang members." (*Id.* at 7, PSOF ¶ 12.) He argues that despite Defendants' knowledge, they simply put Plaintiff in an alternative placement and added known gang members to his DNHW list but that it is common knowledge that no matter where a gang member is housed, he can reach his intended victim. (Doc. 81 at 2.) As to the Court's previous conclusion that denials of requests for PS in 2005, 2006, 2007, 2008 are too remote to form the basis for a claim of assault in July 2010, Plaintiff alleges that the only reason that he was not assaulted was that he continually refused to house at any General Population unit and was sanctioned for that. (*Id.*)

Plaintiff asserts that Matson had possession of all documents sent by Plaintiff and the investigative reports and was aware that Plaintiff had given the names of prisoners who were members of the New Mexican Mafia and of their propensity for violence. (Doc. 76 at 8.) He was aware that the New Mexican Mafia make good on their threats and that Plaintiff requested PS six times and was branded as a PS case and snitch. (*Id.*)

1   Plaintiff claims this was not a difference of opinion and that three hours after being

2   moved, Plaintiff was assaulted.  A jury could infer deliberate indifference.  (*Id.* at 8-9.)

3         Plaintiff alleges that Haley was employed by ADC from June 2004 to October

4   2008 in the PS Unit and was aware that Plaintiff had given names verified to be gang

5   members and knew that Plaintiff would not be safe unless in PS status.  (*Id.* at 9.)  As to

6   Smith, Plaintiff argues that under DO 805, the PS process should have been started; the

7   allegation that Smith failed to start the process is "just one more in the continuing failure

8   by ADOC staff" to respond.  (*Id.* at 10.)  "Were Smith to have started the process then

9   Plaintiff might have convinced them to place him on PS status."  (*Id.*)  Plaintiff explained

10   face to face to Smith that he needed PS; he disputes Smith's claims that the signature on

11   the inmate letter is not his.  (Doc. 81 at 3-4.)  Regarding Ryan, Plaintiff contends that it

12   was incumbent upon Ryan to step in when his staff failed to act in this matter and that

13   Ryan knows the Mexican Mafia well.  (Doc. 76 at 10.)  When Plaintiff and his sister sent

14   letters to Ryan, he was obligated to do more than pass them along.  (*Id.* at 11.)

15   Plaintiff's sister is a taxpayer, yet Ryan disregarded her concern for her brother's safety.

16   (Doc. 81 at 1-2.)  The investigators and staff to whom Ryan referred the issue determined

17   that Plaintiff appeared to be telling the truth, was worried about his safety, and there was

18   a degree of risk to Plaintiff.  (*Id.* at 4-5.)

19         Plaintiff argues that Defendants are not entitled to qualified immunity.  Plaintiff

20   argues that his case involves the same gang members and set of facts from a 2005

21   incident.  (Doc. 76 at 11-12.)  Defendants found Plaintiff's information accurate and, the

22   leader of the Hispanic inmates was found to have Plaintiff's request for PS in his cell.

23   (*Id.* at 12.)

24           **3.**   **Reply**

25         Defendants reply that there is no connection between Haley and Plaintiff's 2009-

26   2010 PS requests. He was not on the Protective Segregation Committee that denied his

27   request before the assault and was not involved with Plaintiff's 2009-2010 PS requests.

28

1        As to Ryan and Smith, the August 2009 letter to Ryan from Plaintiff's sister was

2    sent to ADC's Constituent Services Office, which responded in September 2009. (DSOF

3    ¶ 43; Doc. 68, Ex. 24.)  Although Smith does not remember ever receiving the October

4    2009 inmate letter and denies it was his signature on the inmate letter, Plaintiff asserts

5    that Smith sent the inmate letter to his supervisor Officer Osborn.   (Doc. 8 at 11).

6    Defendants contend that Plaintiff is claiming that Smith and Ryan should have directly

7    put him in the PS process.  (Doc. 83 at 2; ref. Doc. 8 at 11; Doc. 76 at 9-11.)  Defendants

8    argue that in fact Plaintiff *was* put through the PS process after these communications

9    were received and before he was assaulted: Plaintiff was involved in the PS process in

10   January, 2010 and was assaulted in July 2010.  (Doc. 83 at 2.)  He was not injured

11   between the time he allegedly gave the inmate letter to Smith in October 2009 or when

12   Ryan received the August 2009 letter and the time he was involved in the PS process.

13   Therefore, there is no connection between Smith and Ryan's actions and the failure to put

14   Plaintiff through the PS process.  (*Id.*)

15       Defendants argue that Matson, as well as two other ADC officials, agreed with

16   DW Ramos that Plaintiff should be alternatively placed and not given PS.  (*Id.* at 3.)

17   There is no dispute that ADC conducted an investigation of Plaintiff's protective

18   segregation situation, noted that his claims were identical to claims that he had been

19   made in the past, investigated through the PS process, and no new information was

20   provided. Plaintiff's disagreement with the determination does not constitute deliberate

21   indifference. (*Id.*)

22       Finally, Defendants reassert their entitlement to qualified immunity.

23       **B.    Analysis**

24       The Court will grant Defendants summary judgment.  Plaintiff fails to create a

25   triable issue of fact that any Defendant was deliberately indifferent to his safety, and in

26   the alternative, the Court finds that Defendants are entitled to qualified immunity.

27

28

1          First, the Court has already found that denials of protective segregation requests in

2    2005, 2006, and 2007[3] are too remote in time to form the basis of a claim for an assault in

3    July 2010.  If Plaintiff was threatened after a denial, the relevant inmates were added to

4    his DNHW list and there is no evidence that he was assaulted following these denials.

5    Plaintiff now claims in his Supplemental Response that the only reason he was not

6    assaulted is that he refused the alternative placements and was sanctioned for that refusal.

7    It is not clear where he was then housed, but even assuming that it was a segregation unit,

8    Plaintiff is speculating that he would have been threatened or assaulted if he had moved

9    to the alternative placement yards. But conclusory allegations, unsupported by factual

10   material, are insufficient to defeat a motion for summary judgment. *Taylor v. List*, 880

11   F.2d 1040, 1045 (9th Cir. 1989); *see Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978,

12   984 (9th Cir. 2007) ("[c]onclusory, speculative testimony in affidavits and moving papers

13   is insufficient to raise genuine issues of fact and defeat summary judgment").  And to the

14   extent that Plaintiff he is challenging the 2005, 2006, and 2007 determinations, these

15   claims are time barred.  Such claims should have been brought within two years of

16   accrual.  *See Wilson v. Garcia*, 471 U.S. 261, 280 (1985); Ariz. Rev. Stat. § 12-542

17   (providing that actions for personal injury must be commenced within two years after the

18   cause of action accrues).

19          Turning to the individual Defendants, the Court finds that Plaintiff creates no

20   triable issue of fact as to Haley's liability.  It is undisputed that Haley was not involved in

21   the 2009 or 2010 requests for PS.  Thus, Plaintiff can show no affirmative link between

22   Haley and the denial of PS for the relevant period and no connection to the assault. *See*

23   *Rizzo v. Goode*, 423 U.S. 362, 371-72 (1976) (to prevail on a  claim under § 1983, a

24   plaintiff must demonstrate that he suffered a specific injury as a result of specific conduct

25

26

27          [3] Although Plaintiff also apparently requested PS in 2008, neither party discusses
     the circumstances or result of that request.  Based on the undisputed evidence that the
28   2009-2010 request raised the same issue that had been addressed previously, the Court
     will assume that no new evidence was presented in connection with the 2008 request.

of a defendant and show an affirmative link between the injury and the conduct of that defendant).

As to Smith and Ryan, it appears that Plaintiff is arguing that both should have placed him into PS or personally initiated the PS process.  But even assuming Smith received the October 7, 2009 Inmate Letter, Plaintiff himself alleges that Smith passed the letter on to his supervisor.  There is no evidence that Smith could have given Plaintiff PS status.  And even if Smith should have taken additional steps, such as isolating Plaintiff, there is no evidence that Plaintiff was harmed by Smith's failure to do so---the assault did not occur until July 2010, after Plaintiff had, in fact, again gone through the PS process.

Likewise, Ryan passed Plaintiff's letter on to prison officials, advising that Plaintiff cooperate with the PS process; he did not ignore the Plaintiff's or Plaintiff's sister's complaints of threats to safety.  The Court finds Ryan had no duty to personally intervene under these circumstances and that he acted reasonably.  A prison official's duty under the Eighth Amendment is to ensure "'reasonable safety.'"  *Farmer*, 511 U.S. 825, 844 (1994) (internal citations omitted).  This means that even if prison officials actually knew of a substantial risk to inmate health or safety, they may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.  *Id.*  In addition, there is no *respondeat superior* liability under § 1983, and, therefore, a defendant's position as the supervisor of persons who allegedly violated Plaintiff's constitutional rights does not impose liability.  *See Monell v. New York City Dep't. of Soc. Servs.*, 436 U.S. 658, 691-92 (1978).  Thus, even if Plaintiff could show that another Defendant was deliberately indifferent, which he cannot, Ryan is not liable. And as with Smith, the assault did not occur until July 2010, after Plaintiff had again gone through the PS process; thus, there is no triable issue of fact as to Ryan's liability.

As to Matson, the undisputed evidence shows that Plaintiff was evaluated for PS in 2010.  It is undisputed that he presented the same evidence that had been evaluated in the past and found insufficient for PS.  (DSOF2, Attach. 2, Bates No. 001, 006, 008.)

1    Plaintiff submits many conclusory statements from other inmates regarding gang violence

2    and that once an inmate is on a hit list, that situation follows him.  He also claims that

3    once an inmate has requested PS, he is labeled as a snitch and subject to violence.  But

4    conclusory allegations, unsupported by factual material, are insufficient to defeat a

5    motion for summary judgment. *See Taylor*, 880 F.2d at 1045; s*ee Soremekun*, 509 F.3d at

6    984.

7            Moreover, Plaintiff submits no evidence that Matson *believed* that Plaintiff was on

8    a hit list and would be subject to violence in any General Population yard and yet denied

9    Plaintiff PS.  DW Ramos concluded that Plaintiff "is not on a hit list" and could not

10   provide additional information.  (DSOF2, Ex. 1, Attach. 2, Bates 014, see also 016.)

11   Plaintiff presents no evidence that Matson "[knew] of and disregard[ed] an excessive risk

12   to inmate . . . safety."  *See Farmer*, 511 US at 837.  Asserting that matters are common

13   knowledge is not sufficient.  And as with Ryan, Matson is free from liability if he

14   responded reasonably to the risk, even if the harm ultimately was not averted.  *Id.* at 844.

15           Courts have observed that "[p]rotecting the safety of prisoners and staff involves

16   difficult choices and evades easy solutions. . . . Courts often lack competence to evaluate

17   fully prison administrative decisions."  *Berg v. Kincheloe*, 794 F.2d 457, 460 (9th Cir.

18   1986) (quoting *Bell v. Wolfish*, 441 U.S. 520, 546, 547-48 (1979).  "Prison administrators

19   therefore should be accorded wide-ranging deference in the adoption and execution of

20   policies and practices that in their judgment are needed to preserve internal order and

21   discipline and to maintain institutional security. *Bell*, 441 U.S. at 547-548.  In *Berg*, the

22   Ninth Circuit affirmed summary judgment for prison officials who investigated a threat to

23   the inmate's safety and stated that "[i]f the evidence only involves a dispute over the . . .

24   existence of arguably superior alternatives . . . the plaintiff has not met his burden and the

25   case should not be submitted to a jury."  794 F.2d at 460, 462.  Likewise, in *Slone v.*

26   *Arizona Department of Corrections*, No. 05-16905, 2009 WL 118952 at *1 (9th Cir. Jan.

27   13, 2009) the district court affirmed summary judgment against an Arizona inmate who

28   claimed that the defendants acted with deliberate indifference because they denied his

protective segregation request "when they investigated his requests and transferred him to a different prison unit as an alternative to placing him in protective segregation." Here, an investigation was conducted and Plaintiff was placed in a yard that the prison administration believed was safe and not populated by the people who had threatened him. Although the subsequent assault was very unfortunate, the prison administration responded reasonably to the perceived risk.

Finally, the Court finds that Defendants are entitled to qualified immunity. Plaintiff had no clearly established right to have Smith or Ryan place him in PS or personally initiate the PS process.   They would have reasonably believed they were acting constitutionally when they passed Plaintiff's PS requests on to other prison officials.   Moreover, Plaintiff had no clearly established right to be placed in PS simply because he had previously requested PS and was therefore allegedly labeled a snitch. While it is disturbing that the request for PS was found in another inmate's cell, (Doc. 73 at 017, 019; Doc. 73-2 at 38, 40), the record shows that this happened in June 2006.

Because there are no triable issues of fact, the Court will grant Defendants' Motion for Summary Judgment.

**IT IS ORDERED** that:

(1)     Defendants' Motion to Strike Plaintiff's Motion for Summary Judgment (Doc. 84) is **granted**, Plaintiff's Motion for Summary Judgment (Doc. 76) is **stricken**, and Plaintiff's Motion for Leave to file his Cross-motion (Doc. 85) is **denied**.

(2)     Plaintiff's Motion for Extension of time to Respond to the Court's *Rand* notice (Doc. 80) is **granted**.

(3)     Defendants' Motion for summary Judgment (Doc. 72) is **granted**.

///

///

///

///

///

1       (4)     The action is terminated, and the Clerk of Court must enter judgment

2   accordingly.

3       DATED this 8th day of September, 2013.

Robert C. Broomfield
Senior United States District Judge